**UNITED STATES DISTRICT COURT**       **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:16-CR-101(12) |
| | § | |
| ROBIN TERRY | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Robin Terry's ("Terry") *pro se* Motion for

Compassionate Release (#733), wherein she requests, for the second time, that the court release

her from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) due to the threat of Coronavirus

Disease 2019 ("COVID-19").[1]  The Government opposes the motion (#735).  After conducting

an investigation, United States Probation and Pretrial Services ("Probation") prepared a report.

Having considered the motion, the Government's response, Probation's report, the record, and

the applicable law, the court is of the opinion that the motion should be denied.

I.     Background

On October 12, 2016, a federal grand jury in the Eastern District of Texas returned a

four-count First Superseding Indictment charging Terry in Count 1 with Conspiracy to Possess

With the Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a

Detectable Amount of Methamphetamine or 50 Grams or More of Methamphetamine (Actual), in

violation of 21 U.S.C. § 846.  Terry was not named in the remaining counts.  On May 24, 2017,

Terry pleaded guilty to the charged offense pursuant to a non-binding plea agreement.

Subsequently, on December 13, 2017, the court sentenced her to 324 months' imprisonment, to

_____

[1] Terry initially filed a Motion for Compassionate Release (#693) on May 29, 2020, which the
court denied on June 15, 2020 (#697).  Accordingly, the court will construe Terry's present motion as a
motion for reconsideration of the court's June 15, 2020, Order.

be followed by a five-year term of supervised release.  Terry is currently housed at Federal Medical Center Carswell ("FMC Carswell"), located in Fort Worth, Texas.  Her projected release date is May 20, 2039.

II.     Analysis

In her present motion, Terry does not present any new bases for relief, assert any novel substantive arguments, raise any significant factual or legal issues warranting redress, show that she is receiving inadequate health care at the federal medical center where she is housed, establish that she would not pose a danger to society if released, or otherwise demonstrate that compassionate release is warranted.  As grounds for her present motion, Terry claims that she suffers from the same litany of medical conditions on which she based her original motion. Terry now claims that one of her medical problems—specifically, her abdominal hernia—has worsened since the court addressed her medical condition in 2020.

When a defendant moves for compassionate release, she must establish three criteria. *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021).  First, she must meet one of two conditions listed in § 3582(c)(1)(A)—either the defendant has extraordinary and compelling reasons that warrant a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) or the defendant is at least 70 years of age, has served at least 30 years in prison, and meets the additional requirements of 18 U.S.C. § 3582(c)(1)(A)(ii).  *Id.* at 391.  Second, the defendant "must show that compassionate release is consistent with the applicable policy statements from the [United States Sentencing Commission ("Commission")]."  *Id.* at 392.  Third, the defendant "must convince the district

judge to exercise discretion to grant the motion after considering the § 3553(a) factors."[2]  *Id.*; *accord United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

In her initial motion for compassionate release, Terry, age 55, asserted that extraordinary and compelling reasons for her release existed due to her medical condition, age, family circumstances, and the threat of COVID-19.  In its Memorandum and Order, dated June 15, 2020 (#697), the court considered Terry's medical condition, age, family circumstances, and the threat of COVID-19, and determined that her circumstances did not constitute an extraordinary and compelling reason warranting her early release from prison.  The United States Court of Appeals for the Fifth Circuit subsequently held in *Shkambi* that when a defendant files a motion for compassionate release on her own behalf, the Sentencing Commission's policy statement in § 1B1.13 is not applicable because that policy statement governs only motions filed by the Director of the BOP.  993 F.3d at 392; *Cooper*, 996 F.3d at 287-88.

Nevertheless, while recognizing that they are not binding, the court views the Commission's policy statement contained in § 1B1.13 and the commentary thereto as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release.  *See United States v. Thompson*, 984 F.3d 431, 433

---

[2] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guideline ("U.S.S.G.") provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

(5th Cir. 2021) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (upholding denial of compassionate release and recognizing that the court was guided in its analysis by the commentary to U.S.S.G. § 1B1.13).  A review of dictionary definitions also sheds light on the meaning of these terms.  The word "extraordinary" is defined as "going beyond what is usual, regular, or customary . . . exceptional to a very marked extent."  *Extraordinary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see United States v. Mitchell*, No. 15-20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021) ("'Extraordinary' is defined as 'exceptional to a very marked extent.'" (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY, UNABRIDGED (2020))).  "Compelling" is defined as "forceful . . . demanding attention . . . convincing."  *Compelling*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see Mitchell*, 2021 WL 1827202, at *2 ("'Compelling' is defined as 'tending to convince or convert by or as if by forcefulness of evidence.'" (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY, UNABRIDGED (2020))).  "Courts have interpreted 'extraordinary' in the context of compassionate release as 'beyond what is usual, customary, regular, or common,' and a 'compelling reason' as 'one so great that irreparable harm or injustice would result if the relief is not granted.'"  *Mitchell*, 2021 WL 1827202, at *2 (quoting *United States v. Sapp*, No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020)).

A.    <u>Medical Condition</u>

Terry complains that she currently suffers from diabetes, hypertension (high blood pressure), hypothyroidism, morbid obesity, fatty liver, hyperlipidemia (high cholesterol), problems with her kidneys and shoulders, and a "very large" hernia in her abdominal area.  When interviewed in connection with her Presentence Investigation Report ("PSR"), prepared on October 20, 2017, Terry reported that she suffered from Type 2 diabetes, hypothyroidism, hypertension, and a large gallstone.  Terry also stated that she had surgery to repair a torn rotator cuff in her left shoulder and a bone spur in her right shoulder.  In addition to the conditions claimed by Terry, medical records obtained by Probation revealed that she also suffered from asthma, chronic obstructive pulmonary disease ("COPD"), hyperlipidemia, gastro-esophageal reflux disease, insomnia, allergic rhinitis, anemia, fatigue, and seasonal allergies.  When her PSR was prepared in 2017, Terry was 5 feet, 1 inch tall and weighed 280 pounds, which, according to the Centers for Disease Control and Prevention ("CDC"), gave her a body mass index ("BMI") of 52.9, indicating she was obese.[3]

Terry's 2021 BOP medical records reflect that she is currently diagnosed with anemia, unspecified thyroid disorder, Type 2 diabetes, major depressive disorder, unspecified mood disorder, post-traumatic stress disorder, hypertension, allergic rhinitis, gastro-esophageal reflux disease, constipation, and an umbilical hernia.  She is prescribed amlodipine, losartan potassium, and hydrochlorothiazide to control her hypertension; aspirin, glipizide, and metformin for her diabetes; levothyroxine to treat her thyroid disorder; pravastatin to aid with her hyperlipidemia;

---

[3] According to the CDC, a BMI below 18.5 is underweight, a BMI between 18.5 and 24.9 is normal, a BMI between 25 and 29.9 is overweight, and a BMI of 30 or above is obese.

and mirtazapine and venlafaxine for depression.  As of March 1, 2021, Terry weighed 263 pounds, giving her a BMI of 49.7, which indicates that she remains obese.

On October 19, 2020, Joseph E. Ronaghan, M.D. ("Dr. Ronaghan"), made the following observation regarding Terry:  "She was evaluated with CT scan of the abdomen and pelvis which showed a ventral/supraumbilical hernia.  She denies any nausea, vomiting or diarrhea.  No bowel or bladder issues."  Dr. Ronaghan further noted that "[i]t was explained to [Terry] that any hernia repair given her current obesity would be doomed to failure in the majority of cases and she should undergo significant weight loss prior to attempting a hernia repair."  A medical note, dated March 17, 2021, indicates that medical staff responded to Terry when her "hernia came out" and "she was unable to self-reduce."  Andrew Hester, M.D., stated that "the hernia was able to reduce with moderate pressure and massage. [O]nce reduced, bowel sound[s] were present in all quadrants and pain was decreased."

In her motion, Terry complains that the BOP is denying her hernia surgery.  Nevertheless, while recognizing that Terry was "denied surgery due to BMI," Kwang Kim, R.D., commented:

> Despite wanting surgery for weight loss, inmate Terry shows low motivation and actions to achieve weight loss from poor dietary habits via commissary and Food Service.  Reviewed Heart Healthy diet, but showed lack of interest.  Instead[,] complains of lack of resources, access to fitness center, healthier diet options[,] despite availability to these resources and diet in modified form during COVID management.

Thus, it appears that Terry herself is precluding surgery for her hernia due to her failure to lose a substantial amount of weight before such surgery can be scheduled.  Terry would face this impediment in the free world just as in prison.

On March 12, 2021, Peter Ramirez, M.D., noted that "[o]verall[,] patient is doing well. No major issues since last visit.  Her blood pressure has improved."  Moreover, Terry is classified

6

as a BOP medical Care Level 2 inmate.  According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 2 inmates "are stable outpatients who require clinician evaluations monthly to every 6 months.  Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring.  Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time."

Upon reconsideration, the court again finds that Terry's medical conditions do not suffice, as they are not terminal, do not substantially diminish her ability to provide self-care in the institutional setting, or otherwise present extraordinary and compelling reasons justifying compassionate release.  *See Thompson*, 984 F.3d at 433.  The court acknowledges that, according to the CDC's website, some of Terry's underlying medical conditions—specficially, hypertension, obesity, and Type 2 diabetes—make her more likely to become severely ill should she contract COVID-19; nonetheless, such commonplace maladies do not make Terry's case "extraordinary." *See id.* at 434.  According to the CDC, 42.5% of the adult population in the United States is obese and 73.6% is overweight.  Due to its pervasiveness, obesity cannot be deemed "extraordinary" in order to merit compassionate release. *See United States v. Harmon*, 834 F. App'x 101, 101 (5th Cir. 2021) (affirming denial of compassionate release to a 52-year-old woman who was obese with a body mass index of 36); *United States v. Grant*, No. 16-00172-01, 2021 WL 149308, at *4 (W.D. La. Jan. 15, 2021) (noting that "while obesity is an underlying medical condition that poses increased risk of severe illness from COVID-19, courts have found that obesity—alone or even paired with other medical conditions—does not provide adequate grounds for compassionate release"); *United States v. Sentimore*, No. 04-382, 2020 WL 7630778, at *2 (E.D. La. Dec. 22, 2020) (finding that defendant's morbid obesity did not rise to the level of an extraordinary and

compelling circumstance that would justify his early release); *United States v. Gordon*, No. 15-20609, 2020 WL 3971013, at *3 (E.D. Mich. July 14, 2020) (denying compassionate release to an obese defendant, reasoning that because "42.4% of American adults are obese and [an] additional 32% are overweight," obesity "is not a condition so [extraordinary] that injustice would result if the relief is not granted").

Further, the CDC also reports that 34.2 million people in the United States, approximately 10.5% of the population, have diabetes. Of those, 90 to 95% have Type 2 diabetes. In light of its prevalence, diabetes cannot be considered "extraordinary" in order to merit compassionate release. *See United States v. Hodgin*, No. 4:15-CR-40110-02-KES, 2021 WL 928179, at *3 (D.S.D. Mar. 11, 2021) (denying compassionate release to inmate who suffers from Type 2 diabetes, hypertension, hyperlipidemia, kidney disease, arthritis, and several other medical conditions); *United States v. Williams*, No. CR 15-83-SDD-EWD, 2021 WL 414825, at *3 (M.D. La. Feb. 5, 2021) (denying compassionate release to inmate with Type 2 diabetes and obesity because there was no evidence these conditions had diminished his ability to provide self-care within the facility); *United States v. Cotto*, No. CV 16-36, 2020 WL 5761192, at *2 (E.D. La. Sept. 28, 2020) (recognizing the seriousness of diabetes and obesity but denying compassionate release because inmate had not shown that he was unable to take care of himself within the confines of the facility or that the BOP could not manage his medical conditions appropriately in view of medical records showing that he was being administered the necessary care); *United States v. Dressen*, No. 4:17-CR-40047-01-KES, 2020 WL 5642313, at *3 (D.S.D. Sept. 22, 2020) (denying compassionate release because the defendant did not identify "how his Type 2 diabetes prevents him from providing self-care in a correctional facility setting or how it amounts to

8

extraordinary and compelling circumstances"); *United States v. Jeffers*, 466 F. Supp. 3d 999, 1007 (N.D. Iowa 2020) (finding that the defendant had not demonstrated extraordinary and compelling circumstances when his diabetes and hypertension were controlled, monitored, and managed by the BOP).

Moreover, according to the CDC, 45% of the adults in the United States (108 million) have hypertension, and of those, only about 24% have their condition under control. Additionally, more than 12% of the adult population of the United States (29 million) has high cholesterol. Due to their frequency, high blood pressure and high cholesterol cannot be viewed as "extraordinary" in order to merit compassionate release. *See Thompson*, 984 F.3d at 434 (noting that neither hypertension nor high cholesterol made the defendant's case "extraordinary" because "nearly half of the adult population in the United States suffers from hypertension" and "roughly 12% of Americans suffer from high cholesterol"); *United States v. Slone*, No. 7:12-05-KKC-4, 2021 WL 164553, at *1 (E.D. Ky. Jan. 19, 2021) (holding that inmate who suffered from heart disease (for which he had a stent), chronic obstructive pulmonary disease (COPD), high cholesterol, obesity, and depression had not established extraordinary and compelling reasons for compassionate release as his condition was not terminal and did not diminish his ability to provide self-care within the prison environment); *United States v. Durham*, No. 3:18-cr-251-MOC-DCK-1, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (finding the fact that the defendant has hypertension, a condition that may increase his risk for severe illness from COVID-19, without more, does not present an "extraordinary and compelling reason" for compassionate release); *United States v. Wilson*, No. 2:18cr132, 2020 WL 4901714, at *5 (W.D. Wash. Aug. 20, 2020) (rejecting the notion that inmate's hypertension claim was sufficient to justify early termination of sentence).

In this instance, Terry's BOP records reveal that she is housed in general population and is ambulatory.  She is able to provide self-care in the institutional setting and is not limited in her activities of daily living.  Moreover, according to her PSR, Terry has been experiencing most of her medical problems for a number of years, yet they did not hamper or prevent her from committing her offense of conviction.  Thus, Terry has failed to establish the existence of medical conditions that would constitute extraordinary and compelling reasons to reduce her sentence.

B.     Presence of COVID-19 in Prison

In her motion, Terry also expresses concerns regarding the spread of COVID-19 among the prison population.  Nevertheless, as of September 15, 2021, the figures available at www.bop.gov list 0 inmates (out of a total inmate population of 1,401) and 10 staff members at FMC Carswell as having confirmed positive cases of COVID-19, 619 inmates and 3 staff members who have recovered, and 7 inmates who succumbed to the disease.  Indeed, according to Terry's medical records, she tested positive for the disease on January 20, 2021, received treatment, and, as of February 4, 2020, had recovered from the virus.  Thus, it appears that the facility where Terry is housed is handling the outbreak appropriately and providing adequate medical care.

Although Terry expresses legitimate concerns regarding COVID-19, she does not establish that the BOP cannot manage the outbreak within her correctional facility or that the facility is specifically unable to treat Terry, if she were to contract the virus once again and develop COVID-19 symptoms, while incarcerated.  *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its

extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification").  Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release.  *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Courts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who, like Terry, have already contracted and recovered from the virus.  *See*, *e.g.*, *United States v. Gipson*, 829 F. App'x 780, 781 (9th Cir. 2020) (affirming denial of compassionate release for a defendant with preexisting conditions who had already contracted

COVID); *United States v. Marley*, No. 16-CR-374 (VEC), 2020 WL 7768406, at *2 (S.D.N.Y. Dec. 30, 2020) ("[A] defendant's successful recovery from COVID-19 weighs against granting that defendant compassionate release." (quoting *United States v. Delorbe-Luna*, No. 18-CR-384, 2020 WL 7231060, at *2 (S.D.N.Y. Dec. 7, 2020))); *United States v. Stockman*, No. H-17-116-2, 2020 WL 5269756, at *3 (S.D. Tex. Aug. 26, 2020) (noting that when an inmate is infected and recovers from COVID-19, the courts have found the risks of infection or severe symptoms or effects because of underlying conditions change and diminish); *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) ("Courts have denied COVID-19-based motions for compassionate release filed by inmates who have already contracted the virus."); *United States v. Shrout*, No. 15-CR-438, 2020 WL 3483703, at *4 (D. Or. June 26, 2020) ("[Defendant] has already contracted COVID-19 and, crucially, the BOP has properly managed the disease.").

Moreover, the BOP is in the process of administering the COVID-19 vaccine to inmates and staff.  To date, the BOP has administered approximately 221,715 doses of the vaccine. According to www.bop.gov, FMC Carswell, where the defendant is housed, has fully inoculated 1,289 inmates and 291 staff members.  Indeed, according to Terry's BOP medical records, she received the first dose of the Pfizer-BioNTech vaccine on February 24, 2021, and the second dose on March 16, 2021.  In the Fifth Circuit and elsewhere, courts have denied early release to inmates with a variety of medical conditions who have been vaccinated for COVID-19.  *See United States v. Walker*, No. 20-cr-20027, 2021 WL 2474088, at *3 (C.D. Ill. June 17, 2021) (holding that because defendant was fully vaccinated, his underlying health conditions—diabetes, heart disease, high blood pressure, asthma, and substance abuse—alone, were insufficient to establish

extraordinary and compelling reasons justifying compassionate release); *United States v. Parham*, No. 1:19-CR-133-LG-RHW-1, 2021 WL 1911899, at *2 (S.D. Miss. May 12, 2021) (finding that "generalized concerns of contracting COVID-19[] are not an 'extraordinary and compelling reason'" where the defendant had received the COVID-19 vaccine); *United States v. Meyer*, No 1:14-cr-00148-01-MC, 2021 WL 1895240, at *1-2 (D. Ore. May 11, 2021) (denying compassionate release to inmate with heart disease, obesity, hyperlipidemia, and a history of smoking because he was fully vaccinated and there was a low infection rate at the facility where he was housed); *United States v. Schad*, No. CR 2:17-225-3, 2021 WL 1845548, at *4 (S.D. Tex. May 5, 2021) (denying compassionate release where the defendant had been fully vaccinated against COVID-19); *United States v. Grummer*, No. 08-CR-4402-DMS, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release and noting that "[a]lthough Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19"); *United States v. Beltran*, No. 6:16-CR-00004, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (denying compassionate release to a high-risk inmate with myriad underlying medical conditions who received the vaccine, finding that "vaccination significantly reduces [the] risk of contracting COVID-19 or experiencing complications related to a COVID-19 infection"); *accord United States v. Nunez-Arias*, No. CR H-16-436, 2021 WL 1537323, at *3 (S.D. Tex. Apr. 19, 2021).

In her present motion, Terry argues that the COVID-19 outbreak and the resulting preventive measures taken within the facility have made her sentence "harsher and more punitive than would otherwise have been the case," because mental health and rehabilitative services are curtailed and inmates experience "substantial fear and anxiety" of death and severe illness due to

COVID-19.  Terry fails to recognize, however, that COVID-19 has disrupted everyone's daily routines and limited their opportunities, both inside and outside of prison, and many experience substantial fear and anxiety about the effects of the disease.  Nonetheless, when ruling on a motion for compassionate release, "the Court must consider every prisoner individually and should be cautious about making blanket pronouncements."  *United States v. Chavez,* No. 3:18-CR-0426-B-11, 2020 WL 4500633, at *3 (N.D. Tex. Aug. 5, 2020) (quoting *United States v. Delgado*, No. 3:17-CR-242-B (01), 2020 WL 2542624, at *3 (N.D. Tex. May 19, 2020)); *see United States v. Ashley*, No. CR 17-00282-KD-B-1, 2020 WL 7771215, at *4 (S.D. Ala. Dec. 30, 2020) (holding that, in considering a motion for compassionate release, the court must take an "individualized and particularized review" of the defendant's characteristics (citing *United States v. Tobias*, No. CR 19-143 (BAH), 2020 WL 4673414, at *5 (D.D.C. Aug. 12, 2020); *United States v. Brown*, No. 13-CR-00030 (ESH), 2020 WL 4346911, at *3 (D.D.C. July 29, 2020); *United States v. Joaseus*, No. 9:16-CR-80011-ROSENBERG, 2020 WL 3895087, at *2 (S.D. Fla. July 10, 2020))).

Furthermore, in an attempt to keep inmates and staff safe, the BOP has modified its operations depending on the operational level of the institution.  Currently, "[i]nstitutions determine their operational level (Level 1, Level 2, or Level 3) based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective community transmission rates."[3] According to the BOP's website, the "BOP

---

[3] According to the BOP, Level 1 requires a medical isolation rate of less than 2%, a facility vaccination rate of greater than or equal to 65%, and a community transmission rate of less than 50 per 100,000 over the last seven days; Level 2 requires a medical isolation rate of 2% to less than 7%, a facility vaccination rate of 50% to less than 65%, and a community transmission rate of 50 to 99 per 100,000 over the last seven days; and Level 3 requires a medical isolation rate of greater than or equal to 7%, a facility vaccination rate of less than 50%, and a community transmission rate of greater than or equal to 100 per

recognizes the importance for inmates to maintain relationships with friends and family.  During modified operations in response to COVID-19, the BOP suspended social visitation, however, inmates were afforded 500 (vs. 300) telephone minutes per month at no charge to help compensate for the suspension of social visits."  Moreover, the BOP has modified its operations to allow "[i]nstitutions with active COVID-19 cases [to] make exceptions to [] programming requirements for the safety of inmates and staff."  Additionally, under Level 3 Operations, FMC Carswell's current operational level, "inmates are limited in their movements to prevent congregate gathering and maximize social distancing;" however, "inmate movement in small numbers is authorized for the following purposes:  commissary, laundry, showers three times each week, and telephone."

Nevertheless, "[w]ith respect to motions for compassionate release based on COVID-19, 'the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances.  Rather, those circumstances are applicable to all inmates who are currently imprisoned and hence are not unique to any one person.'"  *United States v. Iruegas*, No. CR 2:18-366, 2021 WL 1169348, at *2 (S.D. Tex. Mar. 25, 2021) (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 291 (W.D. La. 2020)); *United States v. Dodge*, No. CR 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (same); *see also United States v. Cruz-Cruz*, No. CR13-49RSL, 2021 WL 1968389, at *4 (W.D. Wash. May 17, 2021)* ("Defendant's allegations regarding general conditions of confinement, coupled with vague allegations of COVID-19 exposure and damage to mental health, are insufficient to establish extraordinary and compelling reasons exist."); *United States v. Wright*, No. 17-CR-0301, 2020 WL 7334412, at *5 (D. Minn. Dec. 14, 2020) ("It is undisputed that the BOP has implemented

100,000 over the last seven days.

numerous measures to prevent and mitigate COVID-19 outbreaks within its facilities.").  The safety measures that have been implemented benefit Terry, other inmates, and BOP staff members during the pandemic.  The consequential inconveniences presented by the BOP's modified operations on Terry's daily activities do not create an extraordinary and compelling reason to reduce her sentence.

C.    Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the 3553(a) factors); *Keys*, 846 F. App'x at 276; *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  Terry's offense of conviction stems from her participation in a drug-trafficking conspiracy involving the distribution of 4.5 kilograms or more of a mixture or substance containing a detectable amount of methamphetamine or 4.5 kilograms or more of methamphetamine (actual).  As part of the conspiracy, Terry supplied coconspirators with kilogram quantities of methamphetamine from various sources, which was imported from Mexico, for distribution to others in the Eastern and Northen Districts of Texas.  Terry purchased quantities of methamphetamine from a source of supply based in Lewisville, Texas, at various locations in the area several times per week for a one-year period.  Additionally, Terry continued her boyfriend's drug-trafficking business after his arrest in 2015.  On three occasions in 2016,

16

Terry sold methamphetamine to a confidential informant in controlled buys under the auspices of the Bonham Police Department.

Terry has an extensive criminal history, including prior convictions for eluding a police officer, presenting a driver's license issued to another person, delivery of a controlled substance, possession of a controlled substance (2), possession of drug paraphernalia, credit card abuse, failure to identify as a fugitive from justice, theft (3), possession of a dangerous drug (2), and manufacture/delivery of a controlled substance (2).  Further, Terry was on parole at the time of her offense of conviction.  Moreover, Terry has a history of substance abuse since the age of 14, including the daily use of marijuana and methamphetamine.  She advised Probation that when she was not in custody, she used drugs every day.  In view of the nature and circumstances of her offense of conviction, the quantity of drugs involved, her extensive criminal history, and her history of substance abuse, the court cannot conclude that Terry's early release from prison would afford adequate deterrence or protect the public, as she continues to pose a danger to other persons and to the community as a whole.

In addition, granting Terry compassionate release would fail to provide just punishment for her offense and promote respect for the law.  In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence.  948 F.3d at 694.  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense."  *Id.* at 693-94.  "Moreover, the [district] court, citing the

§ 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Chambliss*, 948 F.3d at 693-94; *see Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"). In the instant case, releasing Terry after she has served only 60 months (or approximately 19%) of her 324-month sentence would similarly minimize the impact of her crime and the seriousness of her offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct.

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693. Where, as here, a prisoner has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release under the circumstances. *Id.* at 693-94; *accord Keys*, 2021 WL 1732282, at *1 (finding that Defendant's argument that the court gave too much weight to his criminal history, "amount[ed] to a mere disagreement with the court's balancing of the § 3553(a) factors, which is not a sufficient ground for reversal."). In exercising its discretion, the court finds that Terry has failed to establish that her medical condition or the threat of COVID-19 and resulting protective measures constitute extraordinary and compelling reasons to release her from prison at this time.

III.   Conclusion

Consistent with the foregoing analysis, Terry's *pro se* Motion for Compassionate Release (#733) is DENIED.

18

SIGNED at Beaumont, Texas, this 15th day of September, 2021.


_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE